IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BERKEY INTERNATIONAL, LLC,<br><br>       Plaintiff,<br>  v.<br><br>ENVIRONMENTAL PROTECTION<br>AGENCY, et al.<br><br>       Defendants. | Civil No. 3:24-cv-01106-CVR |

**APPENDIX TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

Shari Howard (D.P.R. No. G04015)
Mark Walters (Texas Bar No. 00788611)
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20002
Tel: (202) 598-9407
Fax: (202) 514-8865
shari.howard@usdoj.gov
mark.walters@usdoj.gov
*Attorneys for Defendants*

# EXHIBIT 1

5/8/2023

4:42 PM

Received by
EPA Region VIII
Hearing Clerk

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 8

| | |
|---|---|
| IN THE MATTER OF:<br><br>**Berkey International LLC**<br><br>Royal Industrial Park, B-2<br>869 Km 1.5, Barrio Palmas<br>Cataño, Puerto Rico 00962<br><br>PO Box 2206,<br>Orocovis, Puerto Rico 00720<br><br>Respondent. | Docket No. FIFRA-08-2023-0038<br><br>FIFRA SECTION 13(a)<br><br>STOP SALE, USE, or<br>REMOVAL ORDER |

## I.     AUTHORITY

1. This Stop Sale, Use, or Removal Order (Order) is issued pursuant to the authority vested in the Administrator of the United States Environmental Protection Agency by section 13(a) of the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (FIFRA), 7 U.S.C. § 136k(a), which authorizes the Administrator of EPA to issue an order prohibiting the sale, use, or removal of any pesticide or device by any person who owns, controls, or has custody of such pesticide or device whenever there is reason to believe that the pesticide or device is in violation of any provision of FIFRA or the pesticide or device has been or is intended to be distributed or sold in violation of any provision of FIFRA.

2. The undersigned EPA official has been duly authorized to issue this Order.

## II.     GOVERNING LAW

3. Section 12(a)(1)(A) of FIFRA, 7 U.S.C. § 136j(a)(1)(A), provides that it shall be unlawful for any person in any state to distribute or sell to any person any pesticide that is not registered under section 3 of FIFRA, 7 U.S.C. § 136a.

4. Section 12(a)(1)(E) of FIFRA, 7 U.S.C. § 136j(a)(1)(E), provides that it shall be unlawful for any person in any state to distribute or sell to any person any pesticide that is misbranded.

5. Section 2(s) of FIFRA, 7 U.S.C. § 136(s), defines a "person" as "any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not."

6. Section 2(t) of FIFRA, 7 U.S.C. § 136(t), defines "pest," in part, as any "form of terrestrial or aquatic plant or animal life or virus, bacteria, or other microorganism (except viruses, bacteria, or other microorganisms on or in living man or other living animals) which the Administrator declares to be a pest under section 25(c)(1)."

7. Pursuant to the authority in section 25(c)(1) of FIFRA, 7 U.S.C. § 136w(c)(1), the Administrator established that "an organism is declared to be a pest under circumstances that make it deleterious to man or the environment, if it is: . . . [a]ny fungus, bacterium, virus, prion, or other microorganism, except for those on or in living man or other living animals and those on or in processed food or processed animal feed, beverages, drugs … and cosmetics . . . ." 40 C.F.R. § 152.5(d).

8. Section 2(h) of FIFRA, 7 U.S.C. § 136(u), defines "pesticide" as "(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer…."

9. Section 2(gg) of FIFRA, 7 U.S.C. § 136(gg), defines "to distribute or sell" as "to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver."

10. The regulation at 40 C.F.R. § 152.3 further defines the term "distribute or sell" as "the acts of distributing, selling, offering for sale, holding for sale, shipping, holding for shipment, delivering for shipment, or receiving and (having so received) delivering or offering to deliver, or releasing for shipment to any person in any state."

11. Section 2(p) of FIFRA, 7 U.S.C. § 136(p), defines "label" as "the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers" and defines "labeling" in part, as "all labels and all other written, printed, or graphic matter (A) accompanying the pesticide or device at any time; or (B) to which reference is made on the label or in literature accompanying the pesticide."

12. Section 2(q)(1) of FIFRA, 7 U.S.C. § 136(q)(1), provides that, among other reasons, a pesticide is misbranded if:

> (A) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false and misleading in any particular;
>
> (B) it is contained in a package or other container or wrapping which does not conform to the standards established by the Administrator pursuant to section 136w(c)(3) of this title;
>
> (C) it is an imitation of, or is offered under the name of, another pesticide;
>
> (D) its label does not bear the registration number assigned under section 136e of this title [FIFRA section 7] to each establishment in which it was produced;
>
> (E) any word, statement, or other information required by or under authority of this subchapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

(F) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title [FIFRA section 3(d)], are adequate to protect health and the environment; [or]

(G) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title [FIFRA section 3(d)], is adequate to protect health and the environment[.]

13. Section 2(q)(2) of FIFRA, 7 U.S.C. § 136(q)(2), provides that, among other reasons, a pesticide is misbranded if:

> (C) there is not affixed to its container, and to the outside container or wrapper of the retail package, if there be one, through which the required information on the immediate container cannot clearly be read, a label bearing—
> (i) the name and address of the producer, registrant, or other person for whom produced;
> (ii) the name, brand, or trademark under which the pesticide is sold;
> (iii) the net weight or measure of the content, except that the Administrator may permit reasonable variations; and
> (iv) when required by regulation of the Administrator to effectuate the purposes of this subchapter, the registration number assigned to the pesticide under this subchapter, and the use classification[.]

14. FIFRA's labeling requirements at 40 C.F.R. part 156 require that labels for pesticide products must contain several pieces of information, including the producing establishment number, hazard and precautionary statement, and directions for use. 40 C.F.R. § 156.10(a).

### III.   BASIS FOR THE ORDER

15. Respondent, Berkey International LLC, is a limited liability company organized under the laws of Puerto Rico and is therefore a "person" as that term is defined by section 2(s) of FIFRA, 7 U.S.C. § 136(s), subject to FIFRA and its implementing regulations.

16. On November 22, 2022, a representative of the EPA inspected the facility of James Enterprise Inc. doing business as Berkey Filters (JEI), located at 1976 Aspen Circle, Pueblo, Colorado 81006, to determine compliance with FIFRA.

17. At that November 2022 inspection, the EPA observed **Black Berkey Filters** and products containing **Black Berkey Filters** being held for distribution and sale.

   a.

18. The **Black Berkey Filter** product is a water filtration unit that is used in multiple products and may be purchased as part of those products or on its own.

3

19. **Travel Berkey Water Filters**, **Big Berkey Water Filters**, **Royal Berkey Water Filters**, **Imperial Berkey Water Filters** and **Crown Berkey Water Filters (Black Berkey Filter Products**) are sold with **Black Berkey Filters** inserted in the apparatus.

20. At the November 2022 inspection, EPA Inspectors observed that the **Black Berkey Filter** labeling included the following language:
    "Black Berkey Purification Elements:
    VIRUSES: >99.999%
    PATHOGENIC BACTERIA (AND SURROGATES)
    >99.9999% -Exceeds Purification Standard (Log 6): Bacillius atrophaeus (Anthrax Surrogate)".

21. At the time of the November 2022 inspection, the EPA observed the following statements regarding **Black Berkey Filter Products** on the website, https://www.berkeyfilters.com/products/black-berkey-filter:

    a. "Composition[:] Black Berkey Filters are made of a carbon composite containing high-grade coconut shell carbon combined with a proprietary blend of 5 other types of media."
    b. "Our Black Berkey® Filters (sometimes called Black Berkey Elements) are world famous for good reasons. Read below to learn how the Black Berkey® Filters used in all of our systems make purified water. It's a more encompassing level of H20 filtration!"
    c. "The Black Berkey Filters used in all of our systems take water filtration to a whole new level! During testing conducted by independent, EPA-approved laboratories, the Black Berkey Filters removed a long list of water contaminants with never-before-seen results and significantly raised the standard for the water filter industry."
    d. "A pair of Black Berkey Filters comes standard in all of Berkey Water Filter Systems, including the Big Berkey."
    e. "When drinking water that's been filtered using a Black Berkey Filter, you can rest assured that your water is clean and safe for consumption. In fact, Black Berkey purification elements are far more powerful compared to competitors' water filters."
    f. "We tested the filters with more than 10,000 times the concentration of harmful pathogens per liter of water than is required by industry-standard test protocols. This concentration of pathogens is so high that the water exiting the filters should be expected to contain a concentration of 100,000 or more pathogens per liter (99.99% reduction — the requirement in order to be classified for pathogenic removal)."
    g. "Incredibly, Black Berkey water filter elements removed 100% of the pathogens."
    h. "After using the Black Berkey Filters, absolutely no pathogens were found in the effluent or were able to be detected. This set a new standard, allowing us to classify all systems containing the Black Berkey Filters as purifiers."

22. At the time of the November 2022 inspection, the EPA observed the following statements regarding **Black Berkey Filter Products** on the website, https://berkey-store.com/en/faq/faq-water-filter-black-berkey/faq-silver-black-berkey-water-filter.html:

> "Yes, silver is used as an antimicrobial to self-sterilize the Black Berkey® elements. Testing was conducted both internally and by Analytical Services, Inc. to ensure that the silver used does not leach into the purified water."

23. These claims indicate that **Black Berkey Filter Products** are substances or mixtures of substances intended for preventing, destroying, repelling, or mitigating any pest, and thus, pesticides pursuant to section 2(h) of FIFRA, 7 U.S.C. § 136(u).

24. None of the **Black Berkey Filter Products** are registered with the EPA.

25. None of the **Black Berkey Filter Product** labels bear a registration number assigned under FIFRA section 7 to the establishment in which the products were produced, making them misbranded pursuant to section 2(q)(1)(D) of FIFRA, 7 U.S.C. § 136(q)(1)(D).

26. As a result of that November 2022 inspection, the EPA issued a Stop Sale, Use, or Removal Order, FIFRA-08-2023-0011, pursuant to the authority of section 13(a) of FIFRA, 7 U.S.C. § 136k(a), and ordered JEI to immediately cease the sale, use, or removal of all **Berkey Black Filter Products**, **Sport Berkey Replacement Filters**, and **Sport Berkey Water Bottle** units under its ownership, control, or custody, wherever such products are located, except in accordance with the provisions of the Stop Sale, Use, or Removal Order, FIFRA-08-2023-0011.

27. As part of the investigation related to the Stop Sale, Use, or Removal Order, FIFRA-08-2023-0011, the EPA received information related to the products referenced in the FIFRA Stop Sale, Use, or Removal Order, FIFRA-08-2023-0011.

28. EPA has information demonstrating the following:

    a. Respondent sold or distributed **Big Berkey Water Filters**;
    b. Respondent sold or distributed **Travel Berkey Water Filters**;
    c. Respondent sold or distributed **Crown Berkey Water Filters**;
    d. Respondent sold or distributed **Imperial Berkey Water Filters**;
    e. Respondent sold or distributed **Royal Berkey Water Filters**; and
    f. Respondent sold or distributed **Travel Berkey Water Filters**:

29. Accordingly, EPA has reason to believe that Respondent sold or distributed the following **Berkey Black Filter Products**: **Travel Berkey Water Filters**, **Big Berkey Water Filters**, **Royal Berkey Water Filters**, **Imperial Berkey Water Filters**, and **Crown Berkey Water Filters.**

30. EPA has reason to believe Respondent distributed or sold, and continues to distribute or sell, the unregistered pesticides, **Black Berkey Filter Products** in violation of section 12(a)(1)(A) of FIFRA, 7 U.S.C. § 136j(a)(1)(A).

31. EPA has reason to believe Respondent distributed or sold, and continues to distribute or sell, the misbranded pesticides **Black Berkey Filter Products** in violation of section 12(a)(1)(E) of FIFRA, 7 U.S.C. § 136j(a)(1)(E).

## IV.  ORDER

32. Pursuant to the authority of section 13(a) of FIFRA, 7 U.S.C. § 136k(a), EPA hereby orders Respondent to immediately cease the sale, use, or removal of all **Black Berkey Filter Products,** under its ownership, control, or custody, wherever such products are located, except in accordance with the provisions of this Order.

33. The **Black Berkey Filter Products** shall not be sold, offered for sale, held for sale, shipped, delivered for shipment, received; or, having been so received, delivered, offered for delivery, moved, or removed, for any reason, other than in accordance with the provisions of this Order and any provisions of any written modifications to this Order.

34. Should Respondent seek an exception to this Order's prohibitions, Respondent may submit a request to EPA, in accordance with the following:

    a) Requests must be made in writing by electronic mail to Christine Tokarz, Enforcement and Compliance Assurance Division, United States Environmental Protection Agency, at tokarz.christine@epa.gov.

    b) Any request for movement or removal must include a written accounting of the products to be moved, including the quantity (type, number, and volume of containers) to be moved, the address of the facility from which the products will be moved, the address of the destination facility, and an explanation of the reasons for the request.

    c) If the movement or removal is for the purposes of disposal, Respondent must provide written proof of disposal to EPA, including proof of compliance with all applicable federal, state, and local laws.

    d) Any movement or removal of any **Black Berkey Filter Products** made without prior written authorization from EPA in accordance with this paragraph constitutes a violation of this Order and the distribution or sale of an unregistered and misbranded pesticide in violation of FIFRA.

35. Within 30 days of receipt of this Order, Respondent must submit to EPA a written accounting of the **Black Berkey Filter Products** subject to this Order. The accounting must be submitted to Christine Tokarz, at the e-mail address above, and must include the following:

    a) The complete list of media used in the composition of **Black Berkey Filters.**

    b) An accounting of all existing product inventory at any of Respondent's facilities or warehouses, including the location(s) where the products are held, quantities, and container sizes;

    c) A list of each shipment of the **Black Berkey Filter Products** en route to any of Respondent's establishments from any person on or after the date of this Order. The list shall include the quantities being shipped, including number and types of containers, and amount held by each type of container, the name and address or

       addresses from which the shipment was shipped and the destination establishment(s); and

       d) A list of each shipment of **Black Berkey Filter Products** en route from any of Respondent's establishments to any person on or after the date of this Order. The list shall include the quantities being shipped, including number and types of containers, and amounts held by each type of container, the establishment from which the shipment was shipped and the destination establishment(s).

36. Respondent must provide EPA with an updated accounting at least every 30 days thereafter until Respondent no longer has any **Black Berkey Filter Products** in its ownership, custody or control.

37. The information requested herein must be provided whether Respondent regards part or all of it as a trade secret or confidential business information. Respondent is entitled to assert a claim of business confidentiality in accordance with the regulations at 40 C.F.R. § 2.203(b) by labeling such information at the time it is submitted to EPA as "trade secret" or "proprietary" or "company confidential" or other suitable notice. Information subject to a properly made claim of business confidentiality will be disclosed by EPA to the public only in accordance with the procedures set forth at 40 C.F.R. part 2, subpart B. If Respondent does not make a proper claim at the time that it submits the information in the manner described in 40 C.F.R. § 2.203(b), EPA may make this information available to the public without further notice to Respondent.

## V.    OTHER MATTERS

38. Respondent may seek federal judicial review of this Order pursuant to section 16 of FIFRA, 7 U.S.C. § 136n.

39. The issuance of this Order shall not constitute a waiver by EPA of its remedies, either judicial or administrative, under FIFRA or any other federal environmental law to address this matter or any other matters or unlawful acts not specified in this Order.

40. This Order shall be effective immediately upon receipt by Respondent or any of Respondent's agents.

41. Section 12(a)(2)(I) of FIFRA, 7 U.S.C. § 136j(a)(2)(I), provides that it shall be unlawful for any person to violate any order issued under section 13 of FIFRA.

42. This Order shall remain in effect unless and until revoked, terminated, suspended, or modified in writing by EPA.

43. If any provision of this Order is subsequently held to be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and they shall remain in full force and effect.

**UNITED STATES**
**ENVIRONMENTAL PROTECTION AGENCY REGION 8**

Date: _____    By: DAVID COBB  _Digitally signed by DAVID COBB Date: 2023.05.04 18:07:03 -06'00'_

David Cobb, Section Supervisor
Toxics and Pesticides Enforcement Section
Enforcement and Compliance Assurance Division

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JAMES SHEPHERD, ET AL.,

   Plaintiffs,

v.                                                No. 4:23-cv-00826-P

MICHAEL S. REGAN, ADMINISTRATOR
OF THE ENVIRONMENTAL PROTECTION
AGENCY, ET AL.,

   Defendants.

## MEMORANDUM OPINION & ORDER

   Before the Court is Plaintiffs' amended request for a Preliminary Injunction filed August 24, 2023. ECF No. 14. On October 25, 2023, this Court issued an Order advancing Plaintiffs' Amended Motion for Preliminary Injunction to a determination on the merits. ECF No. 30. However, due to Plaintiffs' lack of standing to bring this case, the Court must **DISMISS** Plaintiffs' claims.

## BACKGROUND

   This case centers around the Environmental Protection Agency's ("EPA") issuance of a Stop, Sale, Use, or Removal Order ("SSURO") to manufacturers and sellers of Berkey water filtration products.

   In 2022, the EPA became aware that Berkey water filtration systems contain silver for antimicrobial purposes. The EPA has regulated silver in microbial pesticide products since 1954. After investigating, the EPA determined Berkey water filtration systems are not registered as required by the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"). Between December 2022 and March 2023, the EPA issued SSUROs to certain third-party distributors and manufactures of Berkey filtration products. These SSUROs required each recipient to stop the sale, use, and distribution of the offending products, and to provide the EPA with an update on compliance with the SSURO every thirty days until the offender no longer had FIFRA-violating products.

App. 9

In August 2023, Plaintiffs James Shepherd, on behalf of the James B. Shepherd Trust, and New Millennium Concepts, LTD ("NMCL") filed this suit against the EPA. In their lawsuit, Plaintiffs requested a temporary restraining order ("TRO"), along with preliminary and permanent injunctions estopping the EPA from issuing SSUROs pertaining to the Berkey filtration systems. But neither Shepherd nor NMCL ever received an SSURO from the EPA. On August 10, this Court denied Plaintiffs' TRO request and set an expedited briefing schedule for Plaintiffs' preliminary injunction. On October 25, the Court issued an order advancing the request for a preliminary injunction to a determination on the merits under Federal Rule of Civil Procedure 65. However, before the Court can reach the merits of the case, it must first address standing under Federal Rule of Civil Procedure 12(b)(1).

## LEGAL STANDARD

A Rule 12(b)(1) motion "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). A court must dismiss the action if it determines that it lacks jurisdiction over the subject matter. FED. R. CIV. P. 12(h)(3); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). A dismissal under Rule 12(b)(1) "is not a determination of the merits," and it "does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id.* Accordingly, considering Rule 12(b)(1) motions first "prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id.*

A district court may dismiss for lack of subject matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). A motion to dismiss based on the complaint alone presents a "facial attack" that

requires the court to decide whether the complaint's allegations, which are presumed to be true, sufficiently state a basis for subject matter jurisdiction. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1998). If sufficient, those allegations alone provide jurisdiction. *Id.*

## ANALYSIS

**A. Plaintiffs Have No Article III Standing**

Defendants argue in their Response in Opposition to Plaintiffs' First Motion for Preliminary Injunction that Plaintiffs lack Article III standing. *See* ECF No. 10 at 21. While Defendants' subsequent briefing assumes arguendo that Plaintiffs "may" have Article III standing, Defendants reserved the right to address Article III standing at a later stage. ECF No. 18 at 21. The Court is duty-bound to address standing at this juncture. *See Filer v. Donley,* 690 F.3d 643, 646 (5th Cir. 2012) (It is the duty of a federal court to first decide, *sua sponte* if necessary, whether it has jurisdiction before the merits of the case can be addressed).

"Article III of the Constitution limits federal 'Judicial Power,' that is, federal-court jurisdiction, to 'Cases' and 'Controversies.'" *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Similar to other jurisdictional requirements, this standing requirement cannot be waived. *See Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). The Supreme Court insists upon strict compliance with the standing requirement. *See Raines*, 521 U.S. at 811. "Even when standing is not raised by the parties, the Court must, where necessary, raise the issue *sua sponte*." *Reed v. Rawlings*, 3:18-CV-1032-B, 2018 WL 5113143, at *3 (N.D. Tex. Oct. 19, 2018) (citing *Collins v. Mnuchin*, 896 F.3d 640, 654 n.83 (5th Cir. 2018)) (Boyle, J.). Courts are to assess a plaintiff's "standing to bring each of its claims against each defendant." *Coastal Habitat Alliance v. Patterson*, 601 F. Supp. 2d 868, 877 (W.D. Tex. 2008) (citing *James v. City of Dall.*, 254 F.3d 551, 563 (5th Cir. 2001)).

A plaintiff must have standing to request a preliminary injunction. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). To satisfy the prerequisites of Article III standing, "[the] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements[, and when] a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element." *Id.* (citations omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998). At the pleading stage, general factual allegations are sufficient to establish standing. *See Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019). But, if the allegations are not sufficient to establish standing, the district court is powerless to create jurisdiction on its own accord. *See Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990). "[I]f the plaintiff does not carry his burden clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute, then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (internal citation omitted).

   I.   **Injury In Fact**

The Court first addresses the first prong in *Spokeo*—injury in fact. To demonstrate an injury in fact, a plaintiff "must show that [he] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo. Inc.,* 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* A "concrete" injury must "actually exist... [the injury must be] real, and not abstract." *Id.* at 340. (cleaned up).

Here, Plaintiffs have not established how they have suffered an invasion of a legally protected interest that is either concrete or particularized. Plaintiffs claim that the royalties they receive from licensing the right to sell Berkey water filters to Berkey International, LLC provide them with standing because the diminishing royalties

serve as an injury in fact. *See* ECF No. 14 at 23–24. This connection is too attenuated to the EPA's actions to be considered a "concrete" injury. Plaintiffs are unable to specify and quantify any potential losses of royalties beyond mere conclusory statements that such losses would occur. *See generally* ECF Nos. 14 and 20. These statements fall far short of the particularized injury required to establish Article III standing.

Further, the Court is flummoxed as to why Berkey, a recipient of an SSURO, has not been impleaded into this case.[1] Considering Plaintiffs acknowledge that the James B. Shepherd Trust has a controlling interest in both NMCL and Berkey, it makes little sense to the Court why Plaintiffs would not implead a party that is directly impacted by the actions at issue, instead of rolling the proverbial standing dice with a significantly attenuated injury—or better yet, why Berkey has not filed suit on its own accord against the EPA. Plaintiffs cite an unreported, out-of-district case to support their argument that owed royalties serve as grounds for standing. *See* ECF No. 14 at 23 (citing *Pizza Hut, LLC v. Ronak Foods, LLC*, 2022 WL 3544403 (E.D. Tex. June 17, 2022), *aff'd sub nom. Pizza Hut L.L.C. v. Pandya,* 79 F.4th 535 (5th Cir. 2023)). However, in *Pizza Hut*, the "royalties" at issue were advertising fees that franchisees had to pay in order to receive credit to offset payment obligations owed to Pizza Hut. *See Pizza Hut, LLC,* 2022 WL 3544403 at *11–12. Further, in *Pizza Hut,* the defendants alleged that Pizza Hut had no standing as to advertising fees because the fees were payable to the International Pizza Hut Franchise Holders Association, who were not a party to the case. *Id.* at 12. The Court held that Pizza Hut had standing to recover the advertising fees because if they were not paid to the Franchise Holders Association, the payment obligations defendants owed to Pizza Hut would not be offset and Pizza Hut would be owed the amount due in any event. *Id.* at 39. Thus,

---

[1] In a September 12, 2023 Order, the Court instructed Plaintiffs to provide briefing as to why Berkey International, LLC was not bringing this action as an actual recipient of an SSURO from the EPA. The Court was perplexed when Plaintiffs provided no rational explanation, but instead focused on how the two Plaintiffs, neither of whom received an SSURO, had standing. *See* ECF Nos. 22 and 23.

payments to the non-party Franchise Holders Association ipso facto served as payments to Pizza Hut, who *was* a party to the case.

This case is different. The case here does not deal with royalties or fees the defendant owes the plaintiff, but rather potential royalties owed by a third party to a plaintiff. Further, the royalties in *Pizza Hut* were a concrete injury that was enumerated and specified, not merely hypothesized as is the case here. *Id.* at 20. The royalties were also tied directly to the cause of action in that case, not a tangential, conjectural outcome affecting a third-party. Even further, Plaintiffs cite *Pizza Hut* in their Amended Complaint to support the notion that standing can be achieved based on diminished royalty payments "due to an agency action." ECF No. 14 at 23–24. But *Pizza Hut* never mentions agency action as a causal factor for the relevant dispute. Thus, the Court sees no relevance to this out-of-district, unreported case and is unconvinced there is an injury in fact facing the Plaintiffs here.

## II. Traceability

The Court next turns to whether Plaintiffs' injury is fairly traceable to Defendants' challenged conduct. Assuming arguendo that there was an injury in fact (the Court determined there is not), the supposed injury that Plaintiffs claim (loss of royalties) must be traceable to the EPA issuing SSUROs to third-parties. *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021). The Court determines they are not. There could be a multitude of reasons as to why Plaintiffs have received diminished royalties. There could be a change in consumer preferences to water filters, change in market conditions generally, and as Defendants point out, a class action lawsuit has been filed against NMCL concerning Berkey products in this district. *See* ECF No. 18 at 32; *see also Farrell, et al. v. New Millennium Concepts, LTD*, 3:22-cv-728-M  (N.D. Tex.) (Lynn, J., presiding). Plaintiffs offer no substantive evidence to show that their supposed injury is fairly traceable to the EPA issuing SSUROs to third parties.

## III. Redressability

The Court finally addresses the question of redressability. Here, Plaintiffs cannot show that a favorable decision would redress Plaintiffs'

supposed injuries. Once again, even assuming Plaintiffs satisfy the first two prongs of *Spokeo*, there is no guarantee a stay of the EPA's issuances of SSUROs to third parties would increase the royalties that Plaintiffs receive. As discussed above, there are outside factors that can affect the sales for which Plaintiffs receive royalties. For example, consumers could be aware that it took an injunction for the SSUROs to be lifted, not action taken by the EPA themselves, and still decide to not purchase Berkey products until they get assurances from the EPA that they are safe. There is no guarantee an injunction will redress the Plaintiffs' supposed injury here.

While the higher courts have done no favors for the district court by giving them a distinct blueprint to identify standing[2], the Court simply does not see an injury in fact facing the Plaintiffs, cannot fairly trace the supposed injury to conduct by the EPA, and does not believe granting an injunction would redress Plaintiffs' alleged injury. Royalties from sales from a third party are not enough to support standing and the Court has found no precedent in this Circuit to find standing under such circumstances.

---

[2] Standing jurisprudence has been aptly described as a "morass of imprecision." *N.H. Rt. to Life Pol. Action Comm. v. Gardner*, 99 F. 3d 8, 12 (1st Cir. 1996). Recent decisions from the Supreme Court on this issue are notoriously difficult to reconcile. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255, 277 (2023) (holding that a state lacks standing to challenge federal law preempting state laws on foster child placement, despite that "Congress's Article I powers rarely touch state family law."); *contra. Massachusetts, et al. v. EPA, et al.*, 549 U.S. 497, 519 (2007) (holding that a state had standing to challenge the EPA's decision not to regulate emissions of greenhouse gases because that power was preempted and greenhouse gases affected "the earth and air within [their] domain"); *contra. United States v. Texas*, 599 U.S. 670, 671 (2023) (holding that states near an international border lacked standing to challenge the federal government's immigration enforcement policies because the state's financial injury was not "legally cognizable"); *but see Biden, et al. v. Nebraska, et al,* 143 S. Ct. 2355, 2358 (2023) (holding that Missouri established standing by showing that it "suffered ... a concrete injury to a legally protected interest, like property or money"); *contra. Dept. of Ed. v. Brown*, 600 U.S. 551, 568 (2023) (holding that individual loan borrowers lacked standing to allege the federal government unlawfully excluded them from a one-time direct benefit program purportedly designed to address harm caused by an indiscriminate global pandemic).

### IV.   NMCL is not "Effectively and Constructively" Stopped

Plaintiffs also claim the third-party SSUROs "effectively and constructively" stop NMCL from selling Berkey filtration systems, thus granting them standing to challenge the SSUROs. ECF No. 23 a 4–5. However, as the facts stand currently, neither James Shepherd, on behalf of the James Shepherd Trust, nor NMCL are at the risk of being held liable by any EPA actions. While Plaintiffs state that NMCL may become subject to the stop orders, the relief sought is a preliminary injunction enjoining the EPA from issuing such SSUROs. *Id.* at 3–4. The Court is unable to grant relief vis-à-vis *existing* SSUROs that would ameliorate a threat of *future* action. Thus, the Court currently has no subject matter jurisdiction to any potential claims NMCL might have in the future. The mere possibility of future harm does not confer Article III standing. *See Clapper,* 568 U.S. at 409 (threatened injury must be certainly impending to constitute injury in fact and allegations of possible future injury are not sufficient).

### B. Plaintiffs Lack Third-Party Standing

The Supreme Court generally frowns upon third-party standing. A plaintiff must "assert his own legal rights and interests, and cannot rest his claims to relief on the legal rights of interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). To invoke third-party standing, a party must have a close relationship to the holder of the rights and the holder must face obstacles to bringing the lawsuit personally. *See e.g., Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *Singleton v. Wulff*, 428 U.S. 106, 114–116 (1976) (plurality opinion).

As discussed above ad nauseum, the Court struggles to understand why Berkey cannot bring suit on its own behalf for alleged wrongs it has faced at the hands of the EPA. While Plaintiffs have a close relationship with Berkey, there is nothing in the record or briefing to suggest that Berkey, the holder of the rights at issue, cannot bring suit on its own behalf. Accordingly, the Court finds that Plaintiffs do not have third-party standing to bring this suit on Berkey's behalf. If Berkey wants to challenge the EPA's actions, it should bring a lawsuit itself, as this Court signaled in a prior Order. *See* ECF No. 22.

### C. Conclusion

Given a preliminary injunction cannot be requested by a plaintiff who lacks standing, the Court had to first determine whether Plaintiffs have standing to challenge the EPA's SSUROs at issue here. *See Fenves*, 979 F.3d at 329. As explained above, the Court finds that they do not. Accordingly, this case must be **DISMISSED** for want of subject matter jurisdiction.[3]

**SO ORDERED** on this **17th day of November 2023.**

*Mark T. Pittman*
Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

[3] In finding that standing is lacking in this case, the Court is in no way disparaging, or opining on, Plaintiffs' claims. Indeed, if true, the claims are quite concerning. However, it is incumbent on the judicial branch to always keep in mind its proper role under our Constitution. The concepts of standing and the case or controversy requirement helps ensure that federal judges "stay in their lane." Otherwise, we risk fulfilling Thomas Jefferson's prediction written 45 years after he wrote the Declaration of Independence:

> It has long however been my opinion, and I have never shrunk from its expression, ... that the germ of dissolution of our federal government is in the constitution of the federal judiciary; ... working like gravity by night and by day, gaining a little to-day and a little tomorrow, and advancing it's noiseless step like a thief, over the field of jurisdiction, until all shall be usurped from the states, and the government of all be consolidated into one. To this I am opposed; because whenever all government, domestic and foreign, in little as in great things, shall be drawn to Washington as the center of all power, it will render powerless the checks provided of one government on another, and will become as venal and oppressive as the government from which we separated.

Letter from Thomas Jefferson to Charles Hammond (August 18, 1821), in 15 THE WRITINGS OF THOMAS JEFFERSON 330–33 (Albert Ellery Bergh Ed.) (1905).